2021 IL App (2d) 190793-U
No. 2-19-0793
Order filed February 4, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-17 |
| QUENTIN N. FISHER, | ) ) ) | Honorable Robert P. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Jorgensen and Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court did not err in finding defendant guilty beyond a reasonable doubt of aggravated DUI when an officer credibly identified the defendant in open court and the State introduced evidence of defendant's blood alcohol content through a hearsay exception provided for in the statute. Because defendant failed to file a post-sentence motion, he waived his arguments with respect to the mandatory 90-day jail sentence.

¶ 2   After a bench trial, defendant, Quentin N. Fisher, was found guilty of six counts of aggravated driving under the influence of alcohol (DUI) in violation of section 11-501 of the Illinois Vehicle Code (Code). 625 ILCS 5/11-501(d)(1)(A) (West 2018), *id.* § 11-501(d)(2)(B). In this direct appeal, defendant contends that the trial court (1) erred in finding him guilty of

aggravated DUI beyond a reasonable doubt when the State elicited improper hearsay evidence to establish his identity as the driver of the motorcycle involved in the accident (2) abused its discretion by admitting evidence of the hospital blood draw without a proper foundation, and (3) improperly sentenced defendant to a mandatory 90-day jail term. For the foregoing reasons, we disagree with defendant's contentions and affirm.

¶ 3                               I. BACKGROUND

¶ 4     The following factual recitation was compiled from the testimony and evidence presented at the trial. On July 29, 2018, defendant participated in a charity motorcycle ride. At approximately 6:00 p.m., defendant was involved in a single-motorcycle accident near the intersection of Route 52 and Grove Road in Kendall County. Several civilians rendered aid to defendant before he was transported via helicopter to Advocate Good Samaritan Hospital (hospital) in Downers Grove. A blood test at the hospital demonstrated that his blood alcohol content (BAC) was 0.190. Defendant was later cited for aggravated DUI, based on his two prior DUI convictions. Defendant waived his right to a jury trial, and a one-day bench trial took place on May 10, 2019.

¶ 5     At trial, the State elicited testimony from several witnesses. Julie Brummel testified that she and her husband, Dennis, were riding their motorcycle on July 29, 2018. At approximately 6:00 p.m., they turned off Route 52 onto Grove Road heading north, when she noticed a group of motorcyclists congregated at the intersection's stop sign. As they rounded an s-curve on Grove Road, they came across three stopped motorcycles and a parked car. In a ditch off the southbound lane, Julie noticed an unidentified male lying face down and a motorcycle. No one else appeared to be involved in the accident. Julie testified that she and Dennis stopped to render aid; while she directed traffic, Dennis performed cardiopulmonary resuscitation (CPR) on the man in the ditch. As she was directing traffic, she noticed that an individual came on foot from one of the farmhouses

north of the accident scene. Julie remained directing traffic until the police, paramedics, and a helicopter arrived. She noticed that before the authorities arrived that the three motorcyclists initially at the scene had left. On cross-examination, Julie admitted she did not know for how long the person in the ditch had been there, and that he was around 15 feet from the motorcycle in the ditch.

¶ 6     Dennis Brummel similarly testified, stating that it was unusual to see "five to six" motorcyclists "chitchatting" at the stop sign at Route 52 and Grove Road. He further testified that as he rounded the s-curve on Grove Road that he noticed a car stopped off the northbound lane and that there were three motorcycles off the southbound lane, near an individual in the ditch. Dennis stated that the individual in the ditch was half on his side, half facing down, and that a damaged motorcycle was on its side "further north" of the man in the ditch. He immediately stopped and began attending to the man, yelling at the other motorcyclists to call 911. He recalled that a man came to the scene on foot from the north. The man on foot arrived next to the man in the ditch at "pretty much at the same time" he did. The two rolled the man onto his back and heard labored breathing coming from him, which Dennis described as "snoring." Dennis was instructed by the 911 operator to begin CPR and did so until the paramedics arrived. He stopped when the individual threw up but swept his mouth to get any remaining debris out and continued CPR. Dennis also saw that the three motorcyclists who were there when he approached the scene had left before the authorities arrived. Through Dennis's testimony, the State introduced six photographs of the accident scene into evidence. He identified the damaged motorcycle in the photos as the one that was in the ditch the day of the accident.

¶ 7     On cross-examination, Dennis admitted that he did not know how long the accident occurred before he arrived on scene. He also stated that the damaged motorcycle was capable of

holding more than one person. On redirect examination, Dennis stated that after the paramedics arrived, he thought that "someone else could have been with [the man in the ditch] [a]nd [he] immediately started checking the cornfield to see if any other body had flown into the cornfield." He found no one. On recross examination, Dennis admitted that his was a "very emotional experience" for him.

¶ 8    The State called Charles Morrow as its next witness, who was driving with his wife, Shelley, in a car northbound on Grove Road at approximately 6:00 p.m. on July 29, 2018. He noticed a group of motorcyclists parked at the stop sign at Route 52 and Grove Road "all looking behind them." He testified that he then saw an individual in the ditch off the southbound lane and stopped the car.  His wife, Shelley, called 911 and remained on the phone with dispatch while a man performed CPR. On cross-examination, Charles stated that another man came on foot from the direction of the farmhouses and stated that "he was at a friend's house" before coming to the scene.

¶ 9    The State next called Charles's wife, Shelley Morrow, who testified that she and her husband were driving home on Grove Road when they stopped at the scene of a single-motorcycle accident. As they pulled up, there were three other motorcyclists there. She took over the phone call from one of the motorcyclists who had also called 911. She noticed that a man came running from the "house area" and that another man and his wife pulled up behind them on a motorcycle. Shelley testified that she was a medical assistant and used her training to assist the authorities to the best of her ability. Shelley testified that while CPR was being performed on him, the man in the ditch emanated a "horrible noise" that sounded like snoring before throwing up. The three other motorcyclists left before the authorities arrived. She watched as the man in the ditch was

transported into the helicopter. On cross-examination, Shelley admitted that she did not see the accident occur and did not know for how long the man had been in the ditch.

¶ 10    The State then called Kevin Notter as its next witness. When asked if he remembered showing up at a crash site on July 29, 2018, Notter responded "I'm sorry, I didn't look at the date. So I'm not positive on the date on it[.] I didn't review what day it fell. I remember it was in July and I did pull up on a crash site. But I don't know the date." Notter recalled that earlier that day he was riding a motorcycle for a charity ride that had approximately 350 participants, including defendant. He testified that he was familiar with defendant as they grew up near each other and had "friends that are friends." He identified defendant as "Quentin Fisher" in open court.

¶ 11    After participating in the charity ride, Notter testified that he went to a friend's house on Grove Road. While there, he heard "a screeching of a tire and a bang." When he "looked down the road" he "saw a culmination of vehicles in front of something[.]" He ran down to the scene and noticed "[t]hat there [was] a bike at the corner on the grass, and there [was] someone laying a ways away from the bike in the ditch. And then there were people there." Notter testified that he remembered thinking "this might be [defendant's] bike." The following exchange then occurred:

"Q. You see your friend—you see this bike, you think it belongs to your friend. Do you see a body?

A. Yes

Q. That's laying in the ditch?

A. Yes

Q. Do you go down to that area towards the body?

A. I know I did. But—

Q. When you proceed to go down towards the body, what do you notice about that body?

A. It's face down.

Q. As you see it face down, do you attempt to move the body?

A. No, there were other people that seemed to know what to do.

I'm sorry, it's very blotchy, I'm not purposefully trying to think about it, but the way I understand that and I held his head when they turned him over[.] I only remember holding his head. But I don't even remember it being a turnover.

Q. Were you able to see who that was?

A. At that time you could not recognize him. But what I did was—again, he was unrecognizable at that time.

Q. Why unrecognizable?

A. His face was extremely swollen, it was black and blue. And what I was doing was taking two and two together, that looked like his bike. I just was under the impression that it would be him.

He was—I don't know if you've seen pictures, but it was—you could not recognize him.

Q. When you say him, who do you mean?

A. Quentin.

Q. And as you're looking at this person, are you able to, even through the black and blue marks, are you able to tell this appeared to be your friend Quentin Fisher?

A. At this—honestly, no. He was unrecognizable. I—not to mention the fact that he was choking and everything else.

Tell you the truth, I couldn't have done—I just held his head, took puke off his face, and so I literally don't remember that.

*** 

Q. And you believe that the defendant was (unintelligible)

MR. DELUCA [DEFENSE ATTORNEY]: Objection.

THE COURT: I'll allow the question.

A. I'm putting two and two together.

BY MS BOYLE [ASSISTANT STATE'S ATTORNEY]: You didn't want to be here today?

A. In a perfect world, I stay out of court. But I'm here, this is my obligation to tell the truth and do what I'm supposed to do."

¶ 12    On cross-examination, Notter noted that he assumed the motorcycle belonged to defendant because he saw it earlier in the day, lined up with other motorcycles. He did not see defendant on the motorcycle but knew each of the other motorcycles in the line, and through a process of elimination gathered it was defendant's. He further averred that he did not see defendant throughout the day and that the motorcycle was capable of holding two people. The following exchange then occurred:

"Q. The face you saw, you said it was not recognizable?

A. No[.]

Q. So, it's clear you can't say here that you recognized that face to be your friend, Quentin?

A. He was unrecognizable. I didn't see an I.D[.] or anything. But he was—the face was so bad[.]

Q. So you cannot identify your friend Quentin as the same person on the side of the road because he was unrecognizable?

A. I would have not have been able to recognize him based on his face."

The State asked no further questions on redirect examination, and Notter was excused.

¶ 13 The State then called Joe Clever-Stock as its next witness. Clever-Stock testified that he has been employed as a flight nurse for two years and was on duty on July 29, 2018. His team, which also included a helicopter pilot and a medic, received a dispatch at approximately 6:00 p.m., to "a motor vehicle accident, motorcycle found down" near the intersection of Route 52 and Grove Road. The team responded to the call and after exiting the helicopter, took their stretcher and equipment to the back of the ambulance to "make contact with the patient." The following exchange then occurred:

"Q. And do you know who the patient was that day?

A. At the time I did not[.] But after getting a report, we found the patient was Quentin Fisher.

MR. DELUCA [DEFENSE ATTORNEY]: Objection, hearsay.

THE COURT: Go ahead.

BY MS. BOYLE [ASSISTANT STATE'S ATTORNEY]: Did you collect a wallet on the scene?

A. Yes.

Q. Was that belonging to the patient?

A. Yes.

Q. Did you collect anything else while on the scene?

A. I would have to refer to my chart. But I believe—I know we had a wallet, clothes that were underneath the patient.

\*\*\*

Q. Was there anything other than the clothing and the wallet that you recovered from the patient?

A. Clothes, wallet, phone and boots[.]

Q. You said you later learned that the patient you were treating was an individual by the name of Quentin Fisher?

A. Yes[.]

Q. When you were treating the patient, can you describe to the—

MR. DELUCA [DEFENSE ATTORNEY]: Objection. My objection is hearsay. If he has a wallet, that's one thing. But I haven't seen the wallet or license or anything. I still object to any reference to Quentin.

THE COURT: With respect to your hearsay objection, she could clear it up[.] I'm gonna overrule your hearsay objection, but I'm mindful of the quality of testimony that's being given at this point."

Clever-Stock then testified that defendant was "unconscious, intubated" and "his respirations assisted." Defendant also suffered from "generalized abrasions." Given the nature of defendant's injuries, Clever-Stock determined that a level one trauma center was necessary, and defendant was flown to the hospital.

¶ 14    When they arrived at the hospital, Clever-Stock provided a brief report to the hospital's trauma team, informing them of the accident scene, the care Clever-Stock rendered to the patient, and other interventions performed on the patient. Clever-Stock also tendered the physical items

recovered from the scene to the hospital staff before transferring the patient to Dr. Tatebe and the trauma team. On cross-examination, Clever-Stock testified that the medications he administered to defendant could "potentiate the effects of alcohol" but clarified on re-direct examination that those medications do not impact a patient's BAC.

¶ 15    Next, the State called Dr. Leah Tatebe, who testified that she was employed as the in-house trauma surgeon at the hospital and was working a 24-hour shift on July 29, 2018. She defined a level one trauma as a critical injury, such as a patient needing an airway or a stab wound/gunshot, that needs an immediate evaluation by a surgeon. She was then asked if she treated "a patient that day by the name of Quentin Fisher with a date of birth of November 10, 1981?" To which she replied in the affirmative. Defense counsel objected to a leading question. The trial court overruled the objection.

¶ 16    Dr. Tatebe then described the standard protocol that all level one trauma patients receive at the hospital, which includes blood work that checks for, among other things, electrolyte levels, kidney function, red blood cell count, and a toxicology screen. Dr. Tatebe testified that she ordered such a blood work test for defendant. The blood was drawn and sent to the hospital's lab, and the results were uploaded into defendant's electronic medical record. Dr. Tatebe then identified State's exhibit number 1 as the results of the "serum alcohol level for the patient Quentin Fisher that was drawn on July 29, 2018." Defense counsel objected to its admissibility and the following exchange occurred:

    "MR. DELUCA [DEFENSE ATTONREY]: Judge, my objection is I understand how its admissible, but there still has been no testimony, she has not identified my client as the person who she treated[.] We just have a name or vague hearsay[.] Took the blood, what time it was drawn. None of these factors. Did she take it.

I think there has to be a link that that blood was taken from my client[.] They don't have that foundation. That's my objection.

THE COURT: Well, based on that objection, my reading of the statute [625 ILCS 5/11-501.4], I'm gonna overrule the objection."

Dr. Tatebe then stated that to the best of her knowledge, none of the medications defendant received in the course of his treatment would have increased defendant's BAC in the toxicology report.

¶ 17    On cross-examination, Dr. Tatebe testified that defendant had a couple of scattered abrasions and was unconscious when he was admitted. She further testified that she participates in determining who the patient is "because we need to figure out who his surrogate is to make his decisions while the person is unconscious[.]" She admitted that she does not know who drew defendant's blood and that defendant was taken off the breathing tube the following morning. On re-direct examination, Dr. Tatebe testified that there is a protocol when drawing blood. A phlebotomist, nurse, or doctor draws the blood and labels the vial with the medical record of the patient. The label contains the date and time the blood was drawn and is initialed by the person who drew the blood. The blood is then sent down to the hospital's laboratory with any other specimens that are coordinated with the patient.

¶ 18    The State then called Henry Rentas, an Illinois State Police forensic scientist, who explained the difference between whole blood and serum blood, what BAC is, and the ratio factor to determine an individual's BAC from serum blood. He then testified that upon reviewing the hospital's blood report, he was able to determine defendant's BAC to be .190.

¶ 19    Finally, the State called Deputy Michael Denyko of the Kendall County Sheriff's Office. Denyko testified that he has been employed as a deputy for ten years and was on duty on July 29,

2018. He responded to a single motorcycle accident with injuries in the 13870 block of Grove Road a little after 6:00 p.m. When he arrived, he noticed a motorcycle off the westside of the street, and a male subject in an ambulance. He observed a helicopter land and take over the treatment of the male subject. Denyko testified that he spoke with witnesses at the scene including Dennis Brummel and Kevin Notter. During the investigation, Denyko stated that Notter identified defendant by name, Quentin Fisher. Defense counsel objected to foundation, and the objection was overruled.

¶ 20    Denyko testified that from the scene, he was able to determine the motorcycle off the west side of the street was traveling southbound when it left the roadway. Denyko used the motorcycle's license plate and vehicle identification number (VIN) to determine to whom the motorcycle belonged. Defense counsel then objected to Denyko answering the question "who did that motorcycle register back to?" on the basis of hearsay. The trial court overruled the objection. Denyko then identified the registration and title for the motorcycle as belonging to defendant, and the State moved to admit the documents into evidence. Defense counsel objected again based on hearsay. The court overruled counsel's objections and admitted the documents into evidence.

¶ 21    Denyko then testified that he took several photographs of the scene, and the State introduced into evidence over 20 photos, showing tire marks, fresh divots in gravel and grass, several images of the motorcycle itself (with the rear fender turned at nearly 90 degrees), and the motorcycle's license plate, headlight, and vomit in the grass. After he documented the scene, Denyko testified that he went to the hospital, where he found the individual who was transported there via helicopter from the accident scene. He identified defendant as the individual in the hospital. He testified that defendant was not responsive, so he spoke with medical staff and received information as to what defendant's BAC was.

¶ 22 On cross-examination, Denyko testified that he did not approach the ambulance or helicopter while defendant was being treated but instead spoke to the "three or four" people on scene. He also took photos of the scene and went to hospital where he saw defendant in the emergency room. He admitted that defendant had some bandages, an IV, and a tube to help him breathe. Denyko admitted he could not remember if defendant's face was bruised or swollen and did not take pictures of defendant. The following exchange then occurred:

"Q. And for how long did you look at this person?

A. Four, five minutes[.]

Q. You're certain of your identification?

A. Yes."

Defense counsel then impeached Denyko from his grand jury testimony, wherein he responded affirmatively to the question "when you came in contact with the individual who was behind the wheel, his name was Quentin Fisher, is that correct?"

"Q. *** Do you understand that question to mean you came in contact with a person, he was behind the wheel of a vehicle, not behind the wheel of a motorcycle, because a motorcycle doesn't have a wheel, correct?

A. Yes.

Q. So, why did you answer yes?

A. Well, it's a general term as far as I'm concerned. I understand what your question is.

Q. Why did you answer yes?

A. Behind the wheel means basically operating it, that's the way I take it.

Q. It's not that you would just answer whatever the State's Attorney asks you to

answer?

A. No.

Q. Just like the State asked you to identify him in court. You wouldn't just identify him to identify him, right?

A. No.

Q. So *** you agree this person was not behind the wheel of a vehicle.

A. No.

Q. But you said he was?

A. Like I said before, I take that as a general term behind the wheel, does not mean he's operating a vehicle. That's my interpretation[.]"

On redirect examination, Denyko averred that he recognized the individual in the hospital as defendant.

¶ 23    The State then rested. The trial court denied defendant's motion for directed finding and proceeded to hear closing arguments. The State argued that based on all the direct and circumstantial evidence presented, it had proved that defendant was guilty of aggravated DUI beyond a reasonable doubt. Defense counsel argued that because none of the State's witnesses properly identified defendant as the individual driving the motorcycle, the State did not prove defendant guilty beyond a reasonable doubt. Counsel highlighted that the only person who identified defendant as the individual involved in the motorcycle accident was Denyko, who was sufficiently impeached, and that Notter testified that he could not recognize the person in the ditch as defendant.

¶ 24    The trial court then made several factual findings. First, it noted that it found the Brummels and Morrows credible, having had an opportunity to observe them, to consider their testimony and

their demeanor. The court did note that none of the first four witnesses identified defendant in court and that there were other individuals immediately present on scene who left before the authorities arrived.

¶ 25     With respect to Notter's testimony, the trial court found that he

"was at a residence north of the accident scene [and] walked or ran up to the crash scene. He through circumstances knew Quentin Fisher, was familiar with Quentin Fisher, had seen him earlier at the event at Shady Oaks[.] He doesn't recall seeing him during the day.

And then testified hearing screeching tires and a bang, seeing other people down the road, ran to where he saw cars, saw a bike and a person in the ditch[.]

Testified that the person was not recognizable. Face was swollen, face was bruised or black and blue[.] Thought it might be Quentin but really couldn't recognize him.

Several times he mentioned he thought it was Quentin's bike or thought it might be Quentin by putting two and two together.

I think generally as it pertains to Mr[.] Notter with his testimony, having had an opportunity to observe him while he was here, while he was testifying, generally I found him to be credible[.] But I believe that he probably went out of his way to be somewhat evasive with the identification of the person in the ditch.

But again, I would highlight part of his answer on direct examination was that he thought it might be Quentin."

The court then discussed generally Clever-Stock, Dr. Tatebe, and Rentas's testimony, highlighting defense counsel's objection to the identification of defendant in Clever-Stock's testimony:

"There was an objection made about Mr[.] Clever-Stock's testimony as far as the identification of the injured person. They indicated they collected clothes, wallet, and boots. Perhaps beyond reviewing the wallet, there's no way that he knew who the injured person was. I'm mindful of that as it pertains to the identification of Mr[.] Fisher[.]"

¶ 26 The trial court then discussed in some depth Denyko's testimony, particularly his identification of defendant and credibility:

"Then we came to Deputy Denyko who was dispatched there and testified as to what he did to investigate the matter. And following up with his investigation and going to the hospital later that day.

Ultimately, I think it was Mr. DeLuca has indicated the testimony of -- the identification by Deputy Denyko is somewhat critical in this regard. But the deputy testified that he had an opportunity to observe the person in the hospital room, he was hooked up.

The testimony of the doctor and the flight nurse was that the person who had been injured was intubated. The doctor indicated he was intubated til [*sic*] the following morning[.]

Doctor testified that there are a certain number of facial abrasions. There was not other testimony that would corroborate Mr. Notter's statement that his face was swollen or heavily bruised so that he would be unrecognizable.

As to Deputy Denyko's questions to the Assistant State's Attorney in one of the grand jury proceedings concerning a one-vehicle accident, there was an individual behind the wheel, that he was taken from the vehicle. I don't find Deputy Denyko's answers to those questions to be untruthful, I don't consider them to be critical with respect to his

understanding of what occurred that day[.] Or more importantly, that he would answer questions affirmatively for the State without regard to what the actual circumstances were[.]

Having said all that, I think Deputy Denyko was certain as to the identification of Mr. Fisher as to the person who was injured."

Thereafter, the court found defendant guilty of all six counts.

¶ 27    On May 30, 2019, defense counsel filed a motion to reconsider and/or motion for a new trial, arguing that the State failed to prove that defendant was the individual driving the motorcycle. The motion further argued that the airlift nurse and trauma surgeon's testimony contained hearsay and both parties were unable to identify defendant in court. The motion also argued that the officer's testimony was "significantly impeached," and his observations of defendant in the hospital were not documented. As a result, the motion argued that the State did not prove defendant guilty beyond a reasonable doubt.

¶ 28    On August 1, 2019, the trial court heard argument on defendant's motion, before denying it. "I had an opportunity to review the motion that was filed, review my notes. I read the transcript, but I believe that respect to the motion, I'm gonna deny the motion to reconsider or for new trial." The court then immediately proceeded to hold the sentencing hearing.

¶ 29    During the sentencing hearing, the trial court first heard argument on defendant's written motion to not impose the statutory mandatory 90-day sentence. In denying defendant's motion, the court simply stated "I think having had an opportunity to look at this earlier, there doesn't appear to be any case law that I could find one way or the other[.] I'm going to deny the motion to not impose a mandatory minimum. I think it's applicable." The court then heard argument on sentencing. After hearing argument, the court merged the counts and sentenced defendant to 90

days in the Kendall County jail (to be served in 45 consecutive weekends), 24 months of probation, and a fine and fees totaling over $4500. The court then admonished defendant:

"THE COURT: You have the right to appeal the judgment and sentence of this court. In order to appeal the judgment, you would need to file a notice of appeal within 30 days of today's date with the clerk of the circuit court.

You have the right to request the clerk prepare and file that notice of appeal on your behalf.

If you wish to challenge the sentence or any aspect of today's sentencing hearing, before taking an appeal you would first need to file with the clerk of the circuit court within 30 days of today's date a written motion asking that I reconsider the sentence I've imposed or reconsider any challenges to the sentencing hearing.

You need to set forth all the reasons you're challenging the sentence or sentencing hearing[.] If the motion to reconsider your sentence is granted, I would conduct a new sentencing hearing.

Anything you fail to put into your written motion would be waived for all time[.] So I wouldn't be able to consider that on appeal after that.

In order to preserve your right to appeal the sentence or sentencing hearing, you need to file a notice of appeal with the clerk of the circuit court within 30 days of the entry of an order disposing of your motion to reconsider[.]

If you're indigent, unable to afford an attorney for the motion to reconsider or the appeal, an attorney would be appointed to represent you at no cost to you.

You have the right to receive a transcript of the proceedings. If you're indigent, a transcript would be provided at no cost to you.

> Do you understand?
>
> THE DEFENDANT: Yes."

Defendant then filed a notice of appeal on August 26, 2019.

¶ 30                                    II. ANALYSIS

¶ 31    On appeal, defendant contends that the trial court made three reversible errors. First, the court erred in finding him guilty of aggravated DUI beyond a reasonable doubt when the State elicited improper hearsay evidence to establish his identity as the driver of the motorcycle involved in the accident. Second, the court abused its discretion by admitting evidence of the hospital blood draw without a proper foundation. And third, the court improperly sentenced defendant to a mandatory 90-day jail term. We review each of his claims in turn.

¶ 32    Defendant initially argues that the trial court erred in finding defendant guilty of aggravated DUI because his identity was not presented by direct or circumstantial evidence, but rather by inadmissible hearsay evidence, brought about through leading questions asked by the State. The State maintains that the court had sufficient evidence before it to find defendant guilty, as there was sufficient circumstantial evidence identifying defendant as the driver and Denyko identified defendant as the individual in the emergency room following the accident. We agree with the State.

¶ 33    When, as here, a defendant contends that the evidence at trial is insufficient to support his conviction, reviewing courts do not retry the defendant. *People v. Day*, 2019 IL App (4th) 160217-B, ¶ 47. Instead, reviewing courts determine "whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Digirolamo*, 179 Ill. 2d 243, 43 (1997). This standard applies whether the evidence was direct or circumstantial. *Id.* "Circumstantial evidence is proof of certain facts and circumstances from which the trier of fact may infer other connected

facts that human experience dictates usually and reasonably follow." *People v. White*, 2016 IL App (2d) 140479, ¶ 37. The State may use circumstantial evidence to prove a defendant guilty of DUI. *People v. Halerewicz*, 20113 IL App (4th) 120388, ¶ 24. We will reverse a conviction only where the evidence is so improbable and unsatisfactory that it creates a reasonable doubt as to defendant's guilt. *People v. Bradford*, 2016 IL 118674, ¶ 12.

¶ 34     Defendant was charged with six counts of aggravated DUI in violation of sections 11-501(d)(1)(A) and 11-501(d)(2)(B) of the Code. 625 ILCS 5/11-501(d)(1)(A) (West 2018), *id* § 11-501(d)(2)(B). To prove defendant guilty of the counts, the State must have established that defendant was driving or in actual physical control of a vehicle while under the influence of alcohol, had at least two prior DUI convictions, and the alcohol concentration in his blood was 0.160 or higher. In his brief, defendant only contests that the State did not establish that he was the individual driving the motorcycle whose blood was drawn at the hospital, arguing that Clever-Stock and Dr. Tatebe's identification testimony of defendant was hearsay.

¶ 35     Hearsay is a statement, other than one made by a declarant while testifying at trial, offered into evidence to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Generally, a hearsay statements is inadmissible at trial, subject to certain exceptions. Ill. R. Evid. 802. When, as here, the case proceeds to a bench trial, the presumption is that the trial court considered only competent (admissible) evidence in reaching its findings, which may only be rebutted where the record affirmatively shows the contrary. *People v. Naylor*, 229 Ill. 2d 584, 603-04 (2008).

¶ 36     A review of the record demonstrates that defense counsel did not object to Dr. Tatebe's testimony as hearsay, but rather as leading, thus we will not address counsel's hearsay argument. Defense counsel did however object to Clever-Stock's testimony that he received a report, which

identified the patient as "Quentin Fisher," as hearsay. Relying on an outside statement (such as a non-admitted medical report) to establish the identity of a defendant is undoubtedly hearsay. However, admission of hearsay identification testimony constitutes error only when it serves as a substitute for courtroom identification or is used to strengthen or corroborate a weak identification. *People v. Mitchell*, 200 Ill. App. 3d 969, 975 (1990). Such evidence is harmless error where it is merely cumulative or is supported by a positive identification and other corroborative circumstances. *Id.* Such is the case here.

¶ 37    In overruling defense counsel's hearsay objection to Clever-Stock's identification testimony, the trial court "was mindful of the quality of testimony" and acknowledged that the State "could clear it up." The State did just that when it elicited testimony from Denyko. Denyko identified defendant as the individual Dr. Tatebe treated in open court. The trial court found Denyko's testimony to be credible and that his in-court identification was "certain[.]" As the finder of fact, the trial court was in the best position to observe the witnesses and make such credibility determinations. *People v. Hernandez*, 319 Ill. App. 3d 520, 533 (2001). Notably, the court also determined that Notter's testimony about the identification of the man in the ditch was "evasive" and highlighted that Notter "thought [the man] might be" defendant, despite his evasive testimony. Significantly, the court noted no other evidence supported Notter's testimony that the man's face was so swollen and bruised as to prohibit identification. (Defendant's assertion that Dr. Tatebe's testimony about "general abrasions" supported Notter's testimony is misguided, as an abrasion is not the same a bruise.) Given Denyko's positive identification of defendant, Notter's evasive testimony, and the presumption that the trial court only considered competent evidence in reaching its findings, we cannot say that the court relied on inadmissible hearsay testimony.

¶ 38    Further, the State introduced additional circumstantial evidence to establish defendant's identity. The damaged motorcycle's title and registration both identified defendant as the owner. It is a natural inference that defendant, as the registered owner of the motorcycle, was the person driving the motorcycle the day in question. See *Day*, 2019 IL App (4th) 160217-B, ¶ 50 (affirming the DUI conviction of the registered owner of a severely damaged abandoned truck even though he was found walking six to eight miles away from the truck); *People v. Lurz*, 379 Ill. App. 3d 958, (2008) (affirming the DUI conviction of the owner of a truck walking one-half mile away from where the truck was parked on the side of the road). Here, defendant was mere feet away from his motorcycle. Notter "put two and two together" at the scene of the accident, and he "thought [the man in the ditch] might be" defendant. There were no unaccounted-for vehicles at the scene, and no other injured persons. Denyko testified that Notter identified the man in the ditch as defendant.[1] All the evidence combined points to defendant as the driver of the motorcycle. As there is no legal distinction between direct and circumstantial evidence as to the weight and effect thereof (*People v. Case*, 246 Ill. App. 3d 566, 576 (1993) citing *People v. Robinson*, 14 Ill. 2d 325, 331 (1958) ), the record overwhelming supports the trial court's findings. Therefore, we cannot say that the trial court erred in finding defendant guilty of aggravated DUI.

----

[1] At oral argument, there was much discussion of whether this statement was inadmissible hearsay or subject to the excited utterance exception. A review of the record before us shows that the basis for defense counsel's objection at trial was "foundation" not hearsay, and there was no such mention of the statement being hearsay in defendant's posttrial motion to reconsider. Thus, this argument is waived. *People v. Enoch*, 122 Ill. 2d, 176, 186 (1988).

¶ 39    Next, defendant argues that the State did not lay a proper foundation to admit into evidence defendant's hospital blood draw. The State in response states that it established the statutory requirements to admit the blood test results through Dr. Tatebe's testimony. Again, we agree with the State.

¶ 40    On review, a trial court's admission of BAC and toxicology evidence in a DUI prosecution will be upheld absent an abuse of discretion. *People v. Maas*, 2019 IL App (2d) 160766, ¶ 61. "The threshold for finding an abuse of discretion is a high one and will not be overcome unless it can be said that the trial court's ruling was arbitrary, fanciful, or unreasonable, or that no reasonable person would have taken the view adopted by the trial court." *People v. Deroo*, 2020 IL App (3d) 170163, ¶ 41. Reasonable minds can differ about whether certain evidence is admissible without having to reverse a trial court's evidentiary ruling under the abuse of discretion standard. *People v. Donoho*, 204 Ill. 2d 159, 186 (2003).

¶ 41    Defendant's blood work was admitted into evidence as an exception to the hearsay rule pursuant to section 11-501.4(a) of the Code. Section 11-501.4(a) provides that the results of a blood test performed for the purpose of determining the BAC of a patient who is receiving medical treatment in a hospital emergency room are admissible as a business record exception to hearsay if (1) the chemical test performed on an individual was ordered in the regular course of providing emergency medical treatment and not at the request of law enforcement, (2) the chemical test performed on an individual was performed by the laboratory routinely used by the hospital, and (3) the results of the test performed upon an individual's blood are admissible into evidence regardless of the time that the record were prepared. 625 ILCS 5/11-501.4(a) (West 2018). Defendant does not argue that the State established the three elements for admissibility, as Dr. Tatebe testified that protocol for all level one trauma patients include a blood toxicology screen

performed at the hospital's on-site laboratory, she ordered the panel to be drawn to treat "Quentin Fisher," and she received the results sometime between 7:00 p.m. and 9:00 p.m. that day. Instead, the crux of defendant's argument is that Dr. Tatebe never identified defendant as "Quentin Fisher" in court. Defendant's argument is misguided.

¶ 42    In *Deroo*, the appellate court affirmed the trial court's finding defendant guilty of aggravated DUI after a single-vehicle accident. 2020 IL App (3d) 170163, ¶ 46. The defendant was treated for injuries at an emergency room, where the treating physician ordered blood work, including a toxicology screen. *Id.* ¶¶ 16-17. At trial, the treating physician identified a copy of the defendant's hospital lab results from the day of the accident, which established that the defendant's BAC was 0.247. *Id.* ¶¶ 17-18. Only an officer and a paramedic personally identified the defendant in court. *Id.* ¶ 11.

¶ 43    We adopt the analysis in *Deroo* here. Dr. Tatebe credibly testified as to the hospital's procedures with level one trauma patients and identified that she ordered a blood test to be performed for Quentin Fisher. She then identified the test results as a true and accurate copy of the results she received while treating defendant for injuries sustained in the accident. Requiring a doctor to personally identify a defendant, as defendant argues here, would add an additional element to the statutory requirements, and we will not do so here. Because the State established the statutory elements necessary to introduce defendant's blood test results, the trial court did not abuse its discretion in admitting the results into evidence.

¶ 44    Finally, defendant contends that the trial court improperly sentenced him to a mandatory 90-day jail term. Defendant argues that the definition of "blood" in section 11-501(d)(2)(B) of the Code, which mandated the 90-day jail sentence, does not contain "hospital blood," which was what the State introduced into evidence at trial. As compelling as that argument may be, it is waived.

¶ 45    Illinois Supreme Court Rule 605 provides, in relevant part,

"[a]t the time of imposing sentence ***, the trial court shall also advise the defendant *** that prior to taking an appeal, if the defendant seeks to challenge the correctness of the sentence, or any aspect of the sentencing hearing, the defendant must file in the trial court within 30 days of the date on which sentence is imposed a written motion asking to have the trial court reconsider the sentence imposed, or consider any challenges to the sentencing hearing, setting forth in the motion all issues or claims of error regarding the sentence imposed or the sentencing hearing [and] that any issue or claim of error regarding the sentence imposed or any aspect of the sentencing hearing not raised in the written motion shall be deemed waived[.]" Ill. S. Ct. R. 605(a)(3)(B) (eff. Oct. 1, 2001).

Here, the trial court did just that. Defendant acknowledged that he understood the admonishments yet did not file a motion to reconsider the sentence within 30 days of the order. We acknowledge that defendant did file a written motion not to impose the 90-day mandatory sentence *before* the sentencing hearing, but such a motion is not incompliance with Rule 605. Our supreme court rules are not mere suggestions, but rather have the force of law that must be obeyed and enforced as written. *People v. Houston*, 226 Ill. 2d 135, 152 (2007). Because defendant failed to file a motion to reconsider his sentence, he has waived the argument on appeal. See *People v. Haley*, 2011 IL App (1st) 093585, ¶ 61 (holding that defendant waived his contention that the circuit court considered an improper aggravating factor in sentencing him by not including it in his timely-filed post-sentence motion to reconsider).

¶ 46                                III. CONCLUSION

¶ 47    For the reasons stated, we affirm defendant's convictions for aggravated DUI and the imposed sentence.

¶ 48    Affirmed.